**In re Billy R. SHURLEY and Jane Bryant Shurley, Debtors.**

**TEXAS COMMERCE BANK–SAN ANGELO, N.A., Texas Commerce Bank–Austin, N.A., and Dennis Elam, Chapter 7 Trustee, Plaintiffs,**

v.

**Billy R. SHURLEY and Jane Bryant Shurley and William H. Armstrong, II, Trustee, Defendants.**

Bankruptcy No. 92–70484–RBK.
Adv. No. 93–7020–RBK.

United States Bankruptcy Court,
W.D. Texas,
Midland–Odessa Division.

Aug. 29, 1994.

---

John P. Higgins, Payne & Blanchard, L.L.P., Dallas, TX, for debtors Billy R. Shurley and Jane Bryant Shurley.

Michael G. Kelly, Odessa, TX, for Dennis Elam, Chapter 7 Trustee.

Eric J. Taube, Austin, TX, for Texas Commerce Bank–Austin, N.A.

Henry H. McCreight, Jr., Houston, TX, for Texas Commerce Bank–San Angelo, N.A.

## AMENDED OPINION

RONALD B. KING, Bankruptcy Judge.

The question in this proceeding is whether the Debtor's interest as the beneficiary of a family trust is property of the Chapter 7 bankruptcy estate. This Court holds that the Debtor's interest in the trust is property of the estate because it does not qualify for spendthrift trust or discretionary trust protection under section 541(c)(2) of the Bankruptcy Code.[1]

### I.

### BACKGROUND

#### A. Parties.

The Plaintiffs in this adversary proceeding are two creditors, Texas Commerce Bank–Austin and Texas Commerce Bank–San Angelo (collectively "TCB"); and Dennis Elam, the Chapter 7 Trustee (Mr. Elam). The Defendants in this adversary proceeding are the Debtors, Billy R. Shurley and Jane Bryant Shurley, and William H. Armstrong, II, the current Trustee of the M.D. Bryant Family Trust.

#### B. The Trust.

The M.D. Bryant Family Trust (the Trust) was created in 1965 by Trust Deed indicating that the settlors were M.D. Bryant, Ethel Bryant, Jane Bryant Shurley and Anne Bryant Ridge, now known as Anne Bryant Watkins.[2] M.D. and Ethel Bryant were the parents of Jane Bryant Shurley and Anne Bryant Watkins. Jane Bryant Shurley's contribution to the Trust res was a 10,947 acre tract of land (the Marfa Ranch) located in Presidio County, Texas and certain mineral interests located in Irion, Presidio, and Tom Green Counties, all located in Texas. The Trust instrument stated that Jane Bryant Shurley and Anne Bryant Watkins each con-

tributed one-sixth of the total value of the Trust corpus, while the remaining two-thirds was contributed by M.D. and Ethel Bryant. These fractional contributions corresponded directly with the initial lifetime income interests enjoyed by the settlors.

On the death of M.D. and Ethel Bryant, Jane Bryant Shurley and Anne Bryant Watkins became equal, one-half lifetime income beneficiaries of the Trust. The Trust also granted each daughter a special power of appointment, executable by deed or will, over an adjusted one-half of the Trust assets. The special power of appointment allowed assignment of Trust assets only to lineal descendants, and prohibited appointment of Trust assets to Mrs. Shurley or Mrs. Watkins or their estates. The "adjusted one-half" referred to the Trustee's ability under the Trust instrument to equitably apportion Trust corpus, such that when Trust corpus was distributed to one beneficiary, that beneficiary's relative Trust interest would be decreased, or other beneficiaries would be provided similar corpus distributions.

The Trust contained both spendthrift and discretionary language. The spendthrift language prohibited voluntary or involuntary transfer of the beneficiary's interest in the Trust. The discretionary language allowed the Trustee almost complete discretion in his distribution of Trust income and corpus.

#### C. Positions of the Parties.

■ Plaintiffs contend that Mrs. Shurley's beneficial interest in the Trust is property of the bankruptcy estate pursuant to section 541(a). They argue that section 541(c)(2), which excepts "protective" trusts from property of the bankruptcy estate, does not apply because Mrs. Shurley's interest in the Trust does not qualify for either discretionary or spendthrift protection.[3] Plaintiffs allege that

---

1. 11 U.S.C. § 541(c)(2) (1988). Title 11 is referred to herein as the Bankruptcy Code.

2. Jane Bryant Shurley and Anne Bryant Ridge were joined by their husbands in executing the Trust. Their joinder appeared to be merely pro forma, however. Neither Mr. Shurley nor Mr. Ridge were named as beneficiaries of the Trust.

3. Spendthrift and discretionary trusts are referred to as "protective trusts" because they attempt to shield trust assets from creditors of beneficiaries. Some courts and authorities refer to all protective trusts generically as "spendthrift trusts" because they achieve similar goals of asset protection. It is helpful to keep the two kinds of trusts separate in analyzing the protective features.

her interest in the Trust has lost, or was never entitled to, protection because (1) it was self-settled or (2) Mrs. Shurley exercised such control over the Trust and its assets so as to defeat the Trust's protective character. Plaintiffs further assert that Mrs. Shurley's special power of appointment over the adjusted one-half of the Trust assets is property of the bankruptcy estate, and that she should be enjoined from exercising the power of appointment. Finally, Plaintiffs argue that Mr. Armstrong should be enjoined from transferring Mrs. Shurley's interest in the Trust to anyone other than Mr. Elam.

Mrs. Shurley and Mr. Armstrong contend that Mrs. Shurley's beneficial interest in the Trust is not property of the estate because, pursuant to section 541(c)(2), the Trust's spendthrift and discretionary provisions protect Mrs. Shurley's interest in the Trust from the claims of creditors and the Bankruptcy Trustee. Mrs. Shurley also alleges that her interest in the Trust is protected as her inheritance under section 541(a)(5) and that her special power of appointment is not property of the estate under section 541(b)(1).

## D. Bankruptcy Law.

■ Section 541(a)(1) defines property of the bankruptcy estate as "all legal or equitable interests of the debtor in property as of the commencement of the case." An inheritance, which the debtor "acquires or becomes entitled to acquire within 180 days" after filing a petition, also becomes property of the estate under section 541(a)(5). Thus, an inheritance accruing more than 180 days post-petition does not become property of the estate.

■ Section 541(c)(2) excepts from property of the estate the debtor's interest in a trust which contains "a restriction on the transfer of a beneficial interest of the debtor" which is enforceable under applicable non-bankruptcy law. Thus, if the Trust is entitled to protection as a spendthrift or discretionary trust under Texas law, the Bankruptcy Code allows enforceability of that protection. In addition, a power of appointment restricted to non-debtor beneficiaries is generally excluded from property of the estate pursuant to section 541(b)(1).

## E. Issues.

1. To what extent, if any, is the beneficial interest of Jane Bryant Shurley property of the estate?

 a. Did the Trust create valid spendthrift or discretionary protection under Texas law?

 b. Is Jane Bryant Shurley a settlor of the Trust?

 c. To what extent, if any, does Jane Bryant Shurley's contribution to the Trust res defeat the Trust's spendthrift or discretionary protection as to her interest?

 d. Does Jane Bryant Shurley's beneficial interest qualify as an inheritance under section 541(a)(5)?

2. To what extent, if any, is the Special Power of Appointment property of the estate?

3. Is injunctive relief proper?

## II.

### DISCUSSION

A. **The extent of Jane Bryant Shurley's beneficial interest as property of the bankruptcy estate.**

1. **Was the language sufficient to create a spendthrift or discretionary trust?**

■ Texas courts have long recognized the validity of spendthrift protection for trust beneficiaries, at least where provisions prohibiting alienation are expressed. *Adams v. Williams,* 112 Tex. 469, 248 S.W. 673, 679 (1923); *Nunn v. Titche–Goettinger Co.,* 245 S.W. 421, 422 (Tex.Comm'n App.1922, judgmt. adopted); *First Bank & Trust v. Goss,* 533 S.W.2d 93, 95 (Tex.Civ.App.— Houston [1st Dist.] 1976, no writ). The Trust's anti-alienation provision was all encompassing and clearly intended to provide spendthrift protection:

The interest of the beneficiaries in the trust estate and the increase and proceeds thereof, both legal and equitable, so long as the same are held in trust, shall not be

subject in any manner to any indebtedness, judgment, judicial process, creditors' bills, attachment, garnishment, execution, receivership, charge, levy, seizures or encumbrance, of or against said beneficiaries; nor shall the interest of the beneficiaries in said trust be in any manner reduced or affected by any transfer, assignment, conveyance, sale, encumbrance, act, omission or mishap, voluntary or involuntary, anticipatory or otherwise, of said beneficiaries and said beneficiaries shall have no right or power to transfer, assign, convey, sell or encumber said trust estate and their interest therein, legal or equitable, during the existence of these trusts.

This language was sufficient to create spendthrift protection for the Trust.

■ Texas courts have also acknowledged the protection afforded beneficial interests by trust language granting the trustee discretion over trust asset distributions. *Hughes v. Jackson,* 125 Tex. 130, 81 S.W.2d 656, 659 (1935); *Kolpack v. Torres,* 829 S.W.2d 913, 915 (Tex.App.—Corpus Christi 1992, writ denied). The Trust gave the Trustee almost absolute discretion with regard to trust asset distributions. The Trust allowed the Trustee to either pay trust income to the life beneficiaries or allow the life beneficiaries to operate Trust ranch properties wholly or partially free of rent. In addition, the Trust allowed, but did not require, the Trustee to distribute "so much of the corpus of said trust as the trustee sees fit" to maintain the beneficiaries' "accustomed manner of living." This language equipped the Trustee with sufficient discretion to protect the beneficiaries' interest from the claims of creditors and make it a discretionary trust.

### 2. Was Mrs. Shurley a settlor?

■ A settlor is one who creates a trust, or furnishes consideration for the cre-

ation of a trust, though in form the trust is created by another. BLACK'S LAW DICTIONARY 1373 (6th ed. 1990) (citing RESTATEMENT (SECOND) OF TRUSTS § 3(1) (1959) and *Lehman v. Comm'r,* 109 F.2d 99, 100 (2d Cir.), *cert. denied,* 310 U.S. 637, 60 S.Ct. 1080, 84 L.Ed. 1406 (1940)); TEX.PROP.CODE ANN. § 111.004(14) (Vernon 1984) (" '[s]ettlor' means person who creates the trust"); *In re Brooks,* 844 F.2d 258, 263 (5th Cir.1988) ("[t]he person who provides consideration for a trust is the settlor even if another person or entity nominally creates the trust"). By transferring property to the Trust, Jane Bryant Shurley created, at least in part, the Trust.[4] *City of Austin v. Cahill,* 99 Tex. 172, 189, 88 S.W. 542, 548, *reh'g denied,* 99 Tex. 201, 89 S.W. 552 (1905) ("[t]o constitute a direct trust, there must be a conveyance or transfer to a person capable of holding it; there must also be an object or fund transferred, and a cestui que trust or purpose to which the trust fund is to be applied."); *Kelly v. Lansford,* 572 S.W.2d 369, 373 (Tex.Civ. App.—Fort Worth 1978, writ ref'd n.r.e.) ("a person has a capacity to create a trust by transferring property inter vivos in trust"); IIA WILLIAM F. FRATCHER & AUSTIN W. SCOTT, SCOTT ON TRUSTS § 156.3 at 179–180 (4th ed. 1987) (hereinafter referred to as SCOTT ON TRUSTS) ("Where the owner of property gratuitously transfers it in trust he is the settlor"); *see* TEX.PROP.CODE ANN. § 112.-001 (Vernon 1984) ("A trust may be created by: ... a property owner's inter vivos transfer of property to another person as trustee for the transferor or a third person."). The fact that co-creators contributed property to the Trust is of no consequence to Mrs. Shurley's status as a creator, nor is Mrs. Shurley's limited participation in the drafting of the Trust instrument relevant. Mrs. Shurley need only deliver property[5] (the Marfa

---

4. The Shurleys' argument that Mrs. Shurley *sold* the Marfa Ranch to the Trust is not supported by the facts. Mrs. Shurley never testified that she sold the Marfa Ranch to the Trust, or gave up her ownership rights in the Ranch solely in exchange for the Trust's assumption of the remaining balance on the Banker's Life note. Rather, she testified that she *conveyed* the property to the Trust because "it was a good deal" and "[w]e agreed that we would do what Daddy wanted."

5. The Shurleys contend that Plaintiffs must prove that Mrs. Shurley had an *equity* interest in the Marfa Ranch at the time of its transfer to the Trust. If she did not have an equity interest they conclude that the transfer was not gratuitous, and, hence, Mrs. Shurley could not be a settlor. *See* SCOTT ON TRUSTS § 156.3 at 179–180 ("Where the owner of property *gratuitously* transfers in trust, he is the settlor."). This argument fails for several reasons. First, the definition of settlor

Ranch and certain mineral interests) in trust to some trustee for the benefit of some beneficiaries (Jane Bryant Shurley, Anne Bryant Watkins, M.D. Bryant, Ethel Bryant and all of their lineal descendants). *Cahill,* 99 Tex. at 189, 88 S.W. at 548.

 Moreover, even if Mrs. Shurley's limited participation in the creation of the Trust instrument served to take away her "creator" status, Mrs. Shurley became a settlor by furnishing consideration for the creation of a trust. *Brooks,* 844 F.2d at 263; *Lehman,* 109 F.2d at 100; SCOTT ON TRUSTS § 156.3 at 179–80. The consideration was the Marfa Ranch and certain mineral interests. In effect, Mrs. Shurley exchanged her property interest in the Marfa Ranch and the mineral interests for a beneficial interest in the Trust.

 The Trust specifically referred to Mrs. Shurley as a settlor. A subsequent "Memorandum of Trust Agreement" stated that Mrs. Shurley, along with the Bryants and Mrs. Watkins, had "created" the Trust. Unambiguous language in a trust makes it unnecessary to use extrinsic evidence to construe the instrument. *Corpus Christi Bank & Trust v. Roberts,* 587 S.W.2d 173, 187 (Tex.Civ.App.—Corpus Christi 1979), *aff'd,* 597 S.W.2d 752 (Tex.1980). The parol evidence rule applies to trust documents. *City of Mesquite v. Malouf,* 553 S.W.2d 639, 643 (Tex.Civ.App.—Texarkana 1977, writ ref'd n.r.e.). Absent fraud, accident or mistake, parol evidence is inadmissible to contradict or vary the terms of an unambiguous agreement. *Jackson v. Hernandez,* 155 Tex. 249, 260, 285 S.W.2d 184, 190 (1955). The Trust unambiguously named Jane Bryant Shurley as a settlor. Even if credible evidence to the contrary had been offered, which it was not, this Court may properly disregard such evidence.

 Finally, Mrs. Shurley signed the Trust and the Memorandum of Trust Agreement. Typically, only settlors sign trust instruments because they are the only parties intended to be bound. Beneficiaries rarely sign a trust instrument because their signature is irrelevant: they have neither placed property in trust, nor given consideration for creation of the trust. Notably, in this case, other contingent beneficiaries existed at the time the Trust and Memorandum of Trust Agreement were executed, but they did not sign either document, and a guardian ad litem did not sign in their stead. Clearly, Mrs. Shurley was a settlor of the Trust.

3. **To what extent, if any, does Jane Bryant Shurley's contribution to the Trust res defeat the Trust's spendthrift or discretionary protection as to her interest?**

 Mrs. Shurley's contribution to the Trust defeats the Trust's spendthrift and discretionary protection as to her interest. To understand why this is so requires an examination of (1) the policy behind self-settled trust rules, (2) the distinction between spendthrift and discretionary trust at-

---

only requires a transfer of a *property* interest; the debtor need not have equity to have a property interest. Here, Mrs. Shurley had fee simple ownership of the Marfa Ranch subject to a deed of trust securing a note, which had a remaining balance of roughly $24,000. Mrs. Shurley transferred that property interest to the Trust.

Second, even if an equity interest was required, it is apparent from the facts that Mrs. Shurley had such an interest. It is highly improbable that a 11,000 acre ranch in Presidio County, Texas that "sold" for $131,366 in 1950 would have subsequently decreased in value to less than $24,000 in 1965 (18% of its original value). Indeed, the estate tax return of M.D. Bryant shows the value per acre of the "other half" of the Marfa Ranch in 1967 was approximately $17.50. The Shurleys' argument would place the value of Mrs. Shurley's "half" of the Ranch at just over $2 per acre in 1965, a value that is hard to accept in light of the 1967 $17.50 per acre figure.

Third, while it is true a gratuitous property transfer clearly establishes a settlor, this does not necessarily mean that a non-gratuitous transferor is not a settlor. Indeed, the current statute, like the prior law, does not clearly distinguish between gratuitous and non-gratuitous property transfers. *Kelly,* 572 S.W.2d at 373 ("a person has a capacity to create a trust by transferring property inter vivos in trust"); TEX.PROP.CODE ANN. § 112.001 (Vernon 1984) ("A trust may be created by: ... a property owner's inter vivos transfer of property to another person as trustee for the transferor or a third person ...").

Fourth, Mrs. Shurley's counsel admitted Mrs. Shurley "had an equity interest, if you use 1950 values, of about $26,000 of that property at the time she put it into the [trust] estate."

tributes, and (3) the case law regarding self-settled spendthrift and discretionary trusts.

### a. Protective trust policy.

■■■ Two foundation policies support the validity of protective trusts. First, the law generally attempts to uphold the intention of a testator or donor. Since a testator or donor could condition a bequest or gift during the life of the beneficiary or donee, a similar policy should apply to a settlor. Second, spendthrift trust provisions are upheld under the rationale that a beneficiary's creditor has no right to rely on the assets and income of a protective trust. Creditors not diligently investigating the availability of trust assets should not be able to later complain about a spendthrift or discretionary provision that existed at trust creation. Similarly, the foundation policy advocating the *in* validity of *self-settled*, protective trusts contends that "[i]t is against public policy to permit a man to tie up his own property in such a way that he can still enjoy it but can prevent his creditors from reaching it." SCOTT ON TRUSTS § 156 at 167; *Glass v. Carpenter*, 330 S.W.2d 530, 533–34 (Tex.Civ. App.—San Antonio 1959, writ ref'd n.r.e.). This corresponds to the old adage that "you can't have your cake and eat it too." These opposing policies turn primarily on one factor—control. Where a settlor has relinquished control over his assets, he ought to be able to condition the transfer and his creditors cannot complain about the conditions. On the other hand, protective trust self-settling is a form of control that unfairly handicaps present and future creditors without restricting a settlor's beneficial use of the assets.

### b. Distinguishing spendthrift and discretionary trusts.

■■■ "Spendthrift" and "discretionary" provisions in a trust shield trust assets from creditors of trust beneficiaries. Trusts with language prohibiting the voluntary or involuntary alienation of the beneficial interest in the trust are considered "spendthrift trusts." Spendthrift trusts provide *direct* protection from creditors of a beneficiary by expressly forbidding alienation of the beneficiary's interest in the trust. RESTATEMENT (SECOND) OF TRUSTS § 152 (1959); SCOTT ON TRUSTS § 152; GEORGE G. BOGERT & GEORGE T. BOGERT, THE LAW OF TRUSTS AND TRUSTEES § 222 (2d ed. rev. 1992) (hereinafter referred to as BOGERT ON TRUSTS). On the other hand, trusts granting a trustee uncontrolled discretion to distribute or not distribute trust income or corpus are considered "discretionary trusts." [6] Discretionary trusts provide *indirect* protection from creditor attachment by placing responsibility for alienation of trust assets with the trustee. RESTATEMENT (SECOND) OF TRUSTS § 155 cmt. b. (1959); SCOTT ON TRUSTS § 155; BOGERT ON TRUSTS § 228. Generally, courts prevent creditors of a beneficiary from attaching trust assets if the trustee controls the time, amount, and manner of payments to a beneficiary. A trust simultaneously possessing both spendthrift and discretionary attributes is labeled a discretionary spendthrift trust. *See, e.g., Altman v. Comm'r*, 83 B.R. 35 (D.Haw.1988); *Wilson v. United States (In re Wilson)*, 140 B.R. 400, 404–06 (Bankr.N.D.Tex.1992).

### c. Case law.

#### 1. Protective trust self-settling.

■■■ Discretionary and spendthrift provisions provide two layers of protection: direct (spendthrift) and indirect (discretionary) restraints on trust asset alienation. SCOTT ON TRUSTS, § 156. In a discretionary spendthrift trust, the threshold question is whether creditors can defeat the spendthrift *and* discretionary provisions in the trust. *See Fewell v. Republic Nat'l Bank of Dallas*, 513 S.W.2d 596, 599 (Tex.Civ.App.—Eastland

---

**6.** The term "discretionary trust" is a term of art most often seen in opposition to the terms "support trust" or "right-to-receive trust." These three trust attributes cover the spectrum of trustee discretion with respect to distribution of trust corpus and income. In a "right-to-receive trust," a beneficiary has a vested right to receive an ascertainable portion of the trust income or principal—the trustee has no discretion. In a "support trust," the beneficiary has right to receive so much of the trust income or principal as is necessary for his education or support—the trustee has limited discretion. In a discretionary trust, the beneficiary has no right to receive trust income or principal—the trustee has sole and absolute discretion.

1974, writ ref'd n.r.e.) (spendthrift provisions of trust are severable and, when defeated, do not destroy the whole trust agreement). Texas courts have consistently upheld the spendthrift shield in the face of creditor attack on a beneficial trust interest. *Adams v. Williams*, 112 Tex. 469, 248 S.W. 673 (1923); *see* BOGERT ON TRUSTS § 222 n. 59. Most cases hold otherwise, however, where a settlor creates a trust in which he is also a beneficiary—a self-settled trust. *Glass*, 330 S.W.2d at 533; *see* TEX.PROP.CODE ANN. § 112.035(d) (Vernon 1984).[7] Because Mrs. Shurley was a settlor, the spendthrift provision in her favor is not effective.[8]

■ Texas courts have also found discretionary trusts nearly impregnable to creditor attack. *Hughes v. Jackson*, 125 Tex. 130, 136–37, 81 S.W.2d 656, 659 (1935); *Kolpack v. Torres*, 829 S.W.2d 913, 915 (Tex. App.—Corpus Christi 1992, writ denied). Self-settling, however, can defeat the protective nature of discretionary trust provisions. It does not matter whether spendthrift provisions, discretionary provisions, or both are found in the trust instrument; the self-settled trust loses the asset shield provided by

both to the extent of the trustee's discretion. *Bank of Dallas v. Republic Nat'l Bank of Dallas*, 540 S.W.2d 499, 500–02 (Tex.Civ. App.—Waco 1976, writ ref'd n.r.e.) (discretionary spendthrift trust defeated by self-settling); *Glass*, 330 S.W.2d at 533 ("one cannot settle upon himself a *spendthrift or other protective trust*, or purchase such a trust from another, which will be effective to protect either the income or corpus against the claims of his creditors, or to free it from his own power of alienation") (emphasis added); RESTATEMENT (SECOND) OF TRUSTS §§ 156(1) & 156(2) (1959); ERWIN N. GRISWOLD, SPENDTHRIFT TRUSTS § 481 (2d ed. 1947);[9] SCOTT ON TRUSTS, § 156.2; BOGERT ON TRUSTS § 228. The existence of other possible beneficiaries makes no difference. *See Altman v. Comm'r*, 83 B.R. 35, 37 (D.Haw.1988) (citing *Cooke Trust Co. v. Lord*, 41 Haw. 198, 205 (1955)) (the entire trust corpus could be reached by the settlor's creditors, despite the existence of other possible beneficiaries, where the terms of the trust allowed the trustee to pay all trust income to the settlor-beneficiary). Moreover, the self-settling rule applies irrespec-

---

7. TEX.PROP.CODE ANN. § 112.035(d) (Vernon 1984) provides:
 If the settlor is also a beneficiary of the trust, a provision restraining the voluntary or involuntary transfer of his beneficial interest does not prevent his creditors from satisfying claims from his interest in the trust estate.
 Although this provision did not exist at the time of Trust creation in 1965, the statute accurately codifies trust law existing prior to 1984 in Texas. *See* BOGERT ON TRUSTS § 223 n. 59.

8. The Shurleys' reliance on *Hines v. Sands*, 312 S.W.2d 275 (Tex.Civ.App.—Fort Worth 1958, no writ), is misplaced. In *Hines*, a creditor sought to garnish the beneficial interest of an employee in an employer's spendthrift, profit-sharing trust. The *employee contributed nothing* to the trust. The employer contributed a portion of businesses' net profits to the trust and then, at its discretion, distributed profit bonuses to the employees. The court specifically found that the employee was not a settlor, despite the argument that the employee gave consideration (skilled labor) for the trust creation. *Id.* at 278. *Hines* is thus not a self-settled trust case. Moreover, the employee beneficiary in *Hines* had no control over potential distributions. Here, Mrs. Shurley self-settled a discretionary spendthrift trust and had some control over potential distributions (e.g., a special power of appointment).

9. § 481 **DISCRETIONARY TRUSTS.** The settlor may attempt to retain a beneficial interest free from the claims of his creditors, by giving his property to a trustee and investing the trustee with complete discretion to decide whether the income shall be paid to him and, if so, how much of it. Thus, A may convey property to T on trust to pay to A during A's life so much of the income as in T's uncontrolled discretion he deems wise, with a provision that on A's death the principal and any accumulated income shall be conveyed to B. The remainder, so far as the principal is concerned, being a present vested remainder in B and not subject to A's control, is beyond the reach of A's creditors, unless the transfer is a fraudulent conveyance. Does the fact that the trustee is given discretion over the disposition of the income exempt the income, likewise, from the claims of creditors? The courts have very properly held that in such a case creditors of the settlor may reach the entire income from the trust property during his life [fn. omitted]. A *person can not settle his own property* so that it will be free from the claims of creditors and yet retain the right to receive the income, if it is paid to any one, during his lifetime.

tive of fraudulent intent.[10] *Glass,* 330 S.W.2d at 533; RESTATEMENT (SECOND) TRUSTS § 156, cmt. a (1959). Because Mrs. Shurley was a settlor, the discretionary provision does not shield her interest in the Trust.

## 2. Dominion and control of settlor.

■ To place any of Mrs. Shurley's beneficial interest into the bankruptcy estate, the Shurleys argue that Plaintiffs must show two elements: (1) self-settling and (2) control by the settlor. This is incorrect. No Texas case has required anything other than self-settling to defeat a protective trust. *Daniels v. Pecan Valley Ranch, Inc.,* 831 S.W.2d 372, 378 (Tex.App.—San Antonio 1992, writ denied), *cert. denied,* —— U.S. ——, 113 S.Ct. 2944, 124 L.Ed.2d 692 (1993); *Bank of Dallas,* 540 S.W.2d at 501; *Glass,* 330 S.W.2d at 533–34; *see* TEX.PROP.CODE ANN. § 112.035 (Vernon 1984). Nor does the relevant section of the RESTATEMENT, adopted by Texas and federal courts, require control in addition to self-settling. RESTATEMENT (SECOND) OF TRUSTS § 156 (1959); *Bank of Dallas,* 540 S.W.2d at 501; *Brooks,* 844 F.2d at 261. The pension trust cases on which the Shurleys rely do not require control *in addition* to self-settling to defeat protective provisions.

■ Federal courts in the Fifth Circuit have examined the validity of "spendthrift" protection in the pension and Employee Retirement Income Security Act (ERISA) trust context through the looking glass of both beneficiary control *and* self-settlement. *Brooks,* 844 F.2d at 263–64; *In re Goff,* 706 F.2d 574, 588 (5th Cir.1983); *In re Kirk,* 101 B.R. 476, 478 (Bankr.N.D.Tex.1989). Either substantial control *or* self-settlement may operate to invalidate protective trust provisions. Like self-settling, beneficiary control of trust

assets is contrary to protective trust rules in that it allows the beneficiary to access what creditors are forbidden. *Goff,* 706 F.2d at 588; RESTATEMENT (SECOND) OF TRUSTS § 153(2) (1959) ("[i]f the beneficiary is entitled to have the principal conveyed to him immediately, a restraint on the voluntary or involuntary transfer of his interest in the principal is invalid."); RESTATEMENT (SECOND) OF TRUSTS § 341, cmt. c (1959) (invalidating spendthrift trust provisions where the sole beneficiary is also the sole trustee). The greater the contributions and the more control an employee has over the contributions to and distributions from a pension trust, the less likely it is the court will enforce protective provisions in a trust, and the more likely it is the employee will be labeled a "settlor." *Brooks,* 844 F.2d at 263–264; *Kirk,* 101 B.R. at 478; *see In re James,* 126 B.R. 360, 362 (Bankr.D.Kan.1991) (where only the employer contributed to pension plan and where the employee-beneficiary had only limited control over trust assets, the 401(k) plan was not self-settled, despite loan and early distribution provisions). Some courts find control, particularly by an alter ego organization, a sufficient condition in and of itself to deny the validity of protective provisions. *In re Kaplan,* 97 B.R. 572 (9th Cir. BAP 1989). Although the Shurleys claim that these ERISA cases support the proposition that dominion and control are required, in addition to self settlement, Texas spendthrift law does not require any more settlor control than is evidenced by self-settling.

■ Even if Texas law did require control in addition to self-settling, however, Mrs. Shurley exhibited sufficient dominion and control over the Trust assets to defeat the Trust's protective character. Mrs. Shurley had extensive control under the Trust instru-

---

10. The Shurleys confuse protective trust with fraudulent conveyance policy when they argue that creditors should not get any more than they would have received "if [Mrs. Shurley] had not purported to tie up her assets." Protective trust policy against self-settling does not require actual or constructive fraud on creditors; it is enough that a settlor has retained beneficial use, without the possible burden of creditor attachment. RESTATEMENT (SECOND) OF TRUSTS § 156, cmt. a (1959). Some debtors transfer or conceal assets with the intent to defraud or elude *contemporaneous* cred-

itors; creditors attempting to avoid these fraudulent conveyances are generally limited in their recovery to the debtor's assets *prior* to transfer. No one has alleged Mrs. Shurley created the Trust to defraud 1965 creditors. In 1965, had the creditors asserted claims to trust assets *under a fraudulent conveyance* theory, they might have extracted Mrs. Shurley's initial contribution from the Trust. Had they asserted the self-settled trust rule, they would have recovered the "interest" Mrs. Shurley "received" or retained under the Trust.

ment itself. First, Mrs. Shurley, in conjunction with her father during his life, had the power to revoke, alter, or amend the Trust document, or distribute the Trust assets back to the settlors. Second, from and after two years following the death of Ethel Bryant, Mrs. Shurley and Mrs. Watkins had the right to petition three "special trustees" for the partial or complete termination of the Trust. The special trustees then had the power to terminate the Trust, with the Trust assets passing equally to Mrs. Shurley and Mrs. Watkins. With no trust res, the special trustees would appear to have no fiduciary duties and would likely "rubber stamp" a decision by Mrs. Shurley and Mrs. Watkins to terminate the Trust. Third, Mrs. Shurley retained and received a special power of appointment over half the Trust assets. The power was exercisable inter vivos or by will. While a special power of appointment, by itself, would not invalidate a protective trust, it is an indication of control when it is retained by a settlor.

Outside the Trust document, the Shurleys also manipulated Trust assets and governed the initial Trustee, Bryant Williams. The Shurleys were regularly able to obtain unrestricted corpus distributions and loans. While the Trust provides for such distributions, the liberality and circumstances under which they were requested and granted suggested a domination by M.D. Bryant, Mrs. Shurley and Mrs. Watkins of Mr. Williams. Only recently had any corpus distribution request been denied, and only recently had the successor Trustee, Mr. Armstrong, started to make only "loans," to the exclusion of corpus distributions. Indeed, in the early days of the Trust, the initial Trustee, on behalf of the Trust, executed promissory notes as a comaker for the Shurleys. Part of the malleability of Bryant Williams may have arisen either from his fear of being replaced for failing to abide by the wishes of Mrs. Shurley and Mrs. Watkins, or from his close relationship with the family. While M.D. Bryant, the Shurleys and the Watkinses may not have held *all* of the puppet strings to Mr.

Williams, they held enough of them to exert the control necessary to defeat the Trust's protective attributes.

Furthermore, the Shurleys held out Trust assets to creditors as if they controlled the assets. In letters and in financial statements, the Shurleys repeatedly treated the Trust as just another bank account from which they could withdraw funds at will. While Generally Accepted Accounting Principles (GAAP) require the reporting of a beneficial interest in a trust on a personal financial statement, the interest must be explained to indicate its nature and extent. The Shurleys suggest that any explanation would require a legal opinion, which GAAP prohibits. An explanation need not, however, include a legal opinion, but rather only a factual explanation. In one instance, the Shurleys reported *all* of the Trust assets (approximately five million dollars in value) in their financial statement submitted to the bank, when in fact Mrs. Shurley had only beneficial rights in one-half of the Trust. Certainly, it was incumbent upon the creditors relying upon the financial statements to perform a sufficient due diligence inquiry into the nature of the Trust. The issue in this adversary proceeding is not whether there were creditor mistakes, however, but whether the Shurleys controlled and manipulated Trust assets to their benefit.[11] The Shurleys' reporting of the Trust corpus as an asset on their balance sheet in order to obtain credit exhibited their perception of control over the Trust assets. On the whole, Mrs. Shurley held and exercised sufficient control to defeat the protective character of the Trust.

### 3. Extent of creditor's reach.

■ The more difficult question requires a determination of the *extent* of the creditor's reach into a self-settled, discretionary spendthrift trust. The Shurleys argue that the reach should be limited to Mrs. Shurley's initial contribution to the Trust corpus, because that is all that would have been available for the creditors in the first place.[12]

---

11. Because a separate adversary proceeding concerning dischargeability of debt is pending, no findings are made concerning reasonable reliance by TCB or intent to deceive by the Shurleys.

12. The Shurleys' argument is appealing at first blush: it limits creditors to what Mrs. Shurley had before entering into the Trust agreement and gives the residue to the other, innocent beneficia-

They argue that Mrs. Shurley's "interest" in the Trust is limited to her initial contribution to the Trust assets. *See* RESTATEMENT (SECOND) TRUSTS § 156(1) (1959). Plaintiffs argue that the reach extends to the maximum amount of the Trust that could be applied for her benefit. *Bank of Dallas*, 540 S.W.2d at 499; RESTATEMENT (SECOND) TRUSTS § 156(2) (1959).

▮ Self-settling of a *spendthrift* trust defeats the non-alienability of the trust to the extent of the settlor-beneficiary's "interest." RESTATEMENT (SECOND) TRUSTS § 156(1) (1959). Self-settling of a *discretionary* trust defeats the non-alienability of the trust to the "maximum amount which the trustee under the terms of the trust could pay to [the settlor-beneficiary] or apply for his benefit." RESTATEMENT (SECOND) TRUSTS § 156(2) (1959). This raises two questions: (1) to what extent does self-settling of a *discretionary spendthrift trust* defeat the non-alien- ability of the trust assets; and (2) what is the difference between the settlor-beneficiary's "interest" and "the maximum amount which the trustee under the terms of the trust could pay . . . or apply for his benefit?"

▮ There is no difference between a settlor-beneficiary's "interest" and "the maximum amount" in the context of a discretionary spendthrift trust. The RESTATEMENT language in sections 156(1) and (2) addresses different concerns. When a *spendthrift* provision is defeated via self-settling, the law is concerned with establishing the settlor-beneficiary's current "interest" in the trust, not the extent of the trustee's discretion. When a *discretionary* provision is defeated via self-settling, the law is concerned with establishing the extent of the trustee's discretion, so as to determine what the trustee can withhold from attaching creditors.[13]

---

ries, Mrs. Shurley's children, M.D. Bryant's grandchildren. The Shurleys' argument, however, has several fatal flaws: it ignores future creditors and requires intricate tracing and valuation of antique assets. The argument concentrates on the 1965 Trust creation, accounting for only those creditors that were present at the Trust creation and ignoring subsequent creditor reliance on Mrs. Shurley's interest in a changing asset mix. In 1965, Mrs. Shurley's creditors knew the extent of Mrs. Shurley's property and presumably should not be entitled to anything more than that property. Had those creditors attacked the spendthrift character of the Trust in 1965, they would have been limited to Mrs. Shurley's "interest" in the Trust (at that time Mrs. Shurley was entitled only to ⅙ of the Trust income, the presumed equivalent of her contribution to the Trust res). The same limits cannot be applied to Mrs. Shurley's subsequent creditors.

Subsequent creditors had a different reliance interest at stake. In 1971, after the deaths of M.D. and Ethel Bryant, the extent of Mrs. Shurley's interest in the Trust changed dramatically; she acquired a discretionary, one-half income and corpus interest in the Trust. With the knowledge of this beneficial interest, subsequent creditors looked beyond Mrs. Shurley's initial contribution for satisfaction of their claims. If the spendthrift character of the Trust was invalid from the beginning, then Mrs. Shurley would have been unable to shield subsequent assets placed in the Trust or directly inherited. For example, had the M.D. Bryant Trust never been created, Mrs. Shurley presumably would have inherited one-half of her parents' estate, which would be subject to creditor attachment. The fact that this "inheritance" is in Trust does not change what creditors can reach absent valid spendthrift or discretionary protection.

13. For example, the interest of a sole settlor retaining a ¹⁄₁₀ beneficial interest in a trust is reachable under discretionary trust law only to the extent of his ¹⁄₁₀ interest, the extent of his retained control (the settlor might otherwise have just given away the remaining ⁹⁄₁₀ interest, in which case the creditors would not recover anything). The interest of a settlor who contributes ¹⁄₁₀ of the assets to a discretionary trust and becomes the sole beneficiary, however, is completely subject to the claims of creditors, again, the extent of his retained control.

If a trust provided one of two beneficiaries with a one-half corpus and income interest in a trust, then, absent spendthrift and other discretionary language, the creditors of one of the beneficiaries could only reach one-half of the trust assets, the beneficiary's "interest." If a spendthrift provision was added, the creditors could not reach any trust assets, except, perhaps, under a fraudulent conveyance theory. If one of the beneficiaries was also the sole settlor of the spendthrift trust, however, creditors could reach that settlor-beneficiary's "interest," one half of the trust assets. If discretionary language were added to the trust, allowing the trustee to reach only one-half of the trust *income*, not corpus, for the benefit of the settlor-beneficiary, the creditors are further limited to one-half of the trust income, "the maximum amount" the trustee could pay or apply for the benefit of the settlor. Thus, the "interest" and "maximum amount" provisions coexist; the first addresses the primary, spendthrift inquiry, while the second addresses the discretionary inquiry.

■ In other words, whether spendthrift protection exists is a threshold question possibly subjecting the settlor-beneficiary's "interest" to liability, but the *extent* of that "interest" is determined by the breadth of the trustee's discretion. The extent of the trustee's discretion is irrelevant to the validity of the spendthrift protection; either the spendthrift attribute exists, or it does not. If it does not, then creditors can reach whatever present or future "interest" the settlor-beneficiary retains. Once the spendthrift provision is defeated, however, the secondary inquiry concerns the extent of the beneficial interest that the trustee *could* distribute to the beneficiary under the discretionary terms of the trust. This prospective inquiry determines the extent to which creditors can reach trust assets.

■ The extent of a creditor's reach in a self-settled trust should not depend upon a settlor's initial contribution.[14] Only a beneficiary, not a settlor, has an "interest" in the trust. A settlor "contributes" or "delivers" property to the trust, but has no "interest" other than what he retains *as a beneficiary.*

The Iowa Supreme Court best expressed this principle in addressing the contention that creditors of a defeated spendthrift trust should be limited to the initial contribution of the self-settlor:

> That the settlement, the abandonment of the [will] contest, and the surrender of the lots devised to [the self-settlor] constitute consideration is hornbook law, but it is insisted that though this be so, it does not subject the trust property, that it merely makes the trust enforceable, and that, therefore all that can in any event be subjected is the consideration paid. We are not impressed with the argument. *When a debtor purchases property, what he pays for it is gone from his creditor.* That alone is sufficient reason why such consideration should not be subjected to the debt. *By the same token, the property bought is the fund the creditor may resort to.* He cannot complain that the debtor did not get enough. He has the right to avail himself of the profits if the debtor did not pay enough.

**14.** The Shurleys' argument to the contrary is based on distinguishable or insupportable case law. One case, *State v. Nashville Trust Co.*, 28 Tenn.App. 388, 393–95, 190 S.W.2d 785, 787–88 (1945), follows the RESTATEMENT rule: "If the beneficiary of a spendthrift trust *already created* pays off encumbrances on the trust property, the beneficiary *has to that extent created a spendthrift trust for himself* and his creditors can reach *his interest to the extent of his payment.*" RESTATEMENT (SECOND) OF TRUSTS § 156, cmt. f (1959) (emphasis added). This apparent exception to the self-settled trust rule carves out a self-settled trust within a spendthrift trust "already created" for the special purpose of preventing a debtor from converting unprotected assets to protected assets. In this context, the rule prevents a debtor from shielding otherwise unprotected assets merely by paying down the debt on protected assets. Mrs. Shurley's case is distinguishable in that she was one of the initial creators of the Trust, not someone seeking to put unprotected assets into an otherwise valid spendthrift trust. She bargained for, and received, an interest in the Trust in exchange for her contribution of the Marfa Ranch. She did not merely pay down an encumbrance to convert unprotected assets, thereby becoming a special purpose "settlor."

In *McKeon v. Department of Mental Health (In re Johannes Trust),* 191 Mich.App. 514, 529, 479 N.W.2d 25, 29 (1991), the court concluded, in a cursory fashion and without offering any support, that creditors of a partially self-settled discretionary trust, which was created for a mentally disabled person, could only reach "that portion of the [trust] assets that came from the [self-settlor]." The RESTATEMENT (SECOND) OF TRUSTS § 156 is not so limited, nor is Texas law.

The Shurleys also mistakenly rely on a footnote in *Farmers State Bank v. Janish,* 410 N.W.2d 188 (S.D.1987). In that case, a judgment creditor sought to garnish a debtor's interest in a spendthrift trust. The Shurleys cite the following footnote for support: "*Although not significant* here because [the debtor's] share in the trust is sufficient to satisfy the creditor's claim, it should be noted that only the *interest* of the debtor in the trust can be reached by her creditors." *Id.* at 190 n. 2 (emphasis added). First, this is dicta, not a holding. Second, the quotation does not indicate that "creditors could reach only the debtor's contributions to a trust, not the contributions of other settlors," as the Shurleys represent in their brief. Rather, the quotation restates the rule announced in RESTATEMENT (SECOND) OF TRUSTS § 156(1) (1959) that creditors can only reach a self-settlor's "interest" in a spendthrift trust. As discussed *infra,* a self-settlor's "interest" is unrelated to a self-settlor's "contribution." If *Janish* intended to limit the extent of the creditors' reach to only the settlor's contributions, this Court disagrees.

*De Rousse v. Williams*, 181 Iowa 379, 164 N.W. 896, 899 (1917) (emphasis added). Here, the situation is similar. Mrs. Shurley traded the Marfa Ranch for a beneficial interest in the Trust. As such, the creditors can only reach what Mrs. Shurley "bought," not what she "paid." Despite the Trustee's decision to retain the Ranch, the Ranch is no longer "available" to the creditors under a self-settled trust theory.[15] Had the Trust exchanged the Ranch for an asset that yielded a 500% return, the creditors would get a windfall; had the Trust exchanged the Ranch for a peppercorn, the creditors would suffer a loss. Either way, the creditors can reach the maximum amount which the Trustee could distribute for Mrs. Shurley's benefit—Mrs. Shurley's beneficial interest in the Trust.[16]

■■■ In addition, the fact that a settlor's initial contribution *remains in the trust* should not be relevant to what creditors can reach. The Marfa Ranch's continuation as a Trust asset should not limit the creditors' recovery. The rule forbidding self-settling must not vary merely because the initial contribution is easily traceable. Had the Marfa Ranch been sold years ago, the court could face a near impossible burden of having to value a decades or century old trust contribution. Such a value would be of precarious validity. Future creditors should not have to trace the proceeds of trust assets "turned-over" numerous times after trust creation to meet their burden of proof. Courts should not have to value property placed in trust decades before, where the evidence of such value is nonexistent or was created by the settlor himself to obtain a lower property tax valuation. Allowing recovery only to the extent of the settlor's initial contribution could lead to inconsistent results, depending on whether assets were retained or sold, and if retained, whether their value went up or down. The Shurleys' argument is not persuasive.

### d. Beneficial interest as inheritance.

■■■ The Shurleys' attempt to characterize Mrs. Shurley's Trust interest as "inheritance" for purposes of section 541(a)(5) fails. The Trust is an inter vivos trust created in 1965. M.D. Bryant died in 1967, and Ethel Bryant died in 1971. While it is true that pour over provisions in the Bryants' wills left the bulk of their estates to the Trust, this does not alter the fact that the Trust was created inter vivos. Inheritance would have occurred, if at all, in 1967 or 1971. Inter vivos trust distributions are not considered interests obtained "by bequest, devise, or inheritance." *In re Newman*, 903 F.2d 1150, 1153–54 & n. 3 (7th Cir.1990) (distinguishing and questioning *Smith v. Moody (In re Moody)*, 837 F.2d 719, 723 & n. 12 (5th Cir.1988) and finding income payments to a beneficiary from an inter vivos trust do not qualify as interests obtained "by bequest, devise or inheritance."); *In re Kragness*, 58 B.R. 939, 944 (Bankr.D.Ore.1986). Mrs. Shurley's beneficial interest in the Trust does not qualify as inheritance.

### B. To what extent, if any, is the power of appointment property of the estate?

■■■■ The power of appointment granted Mrs. Shurley in the Trust did not become property of the bankruptcy estate, despite the fact that the power was exercisable inter vivos. Section 541(b)(1) excludes from property of the estate "any power that the debtor may exercise solely for the benefit of an entity other than the debtor." General powers of appointment, allowing a debtor to transfer trust assets to himself as well as others, are *included* in the property of the estate because they are not "solely" for the benefit of a non-debtor. Special powers of

---

15. A fraudulent conveyance theory may have allowed creditors to reach the Marfa Ranch had creditor action been contemporaneous with trust creation. However, under self-settled trust doctrine, future creditors are only entitled to rely on the "interest" of the beneficiary, be it fertile or barren.

16. The court does not reach the question of whether the circumstances surrounding trust creation constituted an "integral plan" by the Bryants, Mrs. Shurley and Mrs. Watkins, so as to possibly subject the trust to the "reciprocal trust" doctrine, rendering all participants settlors in the entirety of the Trust assets.

The court also finds it unnecessary to decide whether a trust can be revocable for tax purposes and still retain its spendthrift and discretionary protection.

appointment, preventing the debtor from transferring trust assets to himself, are excluded from property of the estate. 4 LAWRENCE P. KING ET AL., COLLIER ON BANKRUPTCY ¶ 541.21 (15th ed. 1994).

Plaintiffs argue that "the type of appointment described in the Trust is not the type excluded under § 541(b) because such appointment would have a substantial impact on the assets of the Bankruptcy Estate." Plaintiffs imply that the Trust contains a general power of appointment, while the Shurleys contend that the power is special. The Trust provided that "[n]either Anne Bryant Ridge [Watkins] nor Jane Bryant Shurley can appoint assets to herself, her creditors, her estate, or the creditors of her estate." The language unequivocally allowed an appointment only in favor of lineal descendants of Mrs. Shurley and Mrs. Watkins. The power is special and, hence, excludable from the property of the estate.

■ Plaintiffs further argue that any attempted exercise of the power would effectuate a post-petition transfer in violation of section 549. While this might be true, it does not bring the power of appointment into the property of the estate. Plaintiffs cite *Williams v. Chenoweth (In re Chenoweth)*, 132 B.R. 161, 166 (Bankr.S.D.Ill.1991), *aff'd*, 143 B.R. 527 (S.D.Ill.1992), *aff'd*, 3 F.3d 1111 (7th Cir.1993), in support. In *Chenoweth* the court found that the debtor's interest in her great-aunt's estate (1) was included in her bankruptcy estate and (2) a disclaimer of inheritance could be avoided by the trustee-in-bankruptcy under section 549. *Chenoweth* does not support the proposition that Mrs. Shurley's power of appointment is includable in her bankruptcy estate or that it cannot be exercised by Mrs. Shurley, but only that if Mrs. Shurley attempts to exercise her power, the trustee may avoid it.

Plaintiffs' assertion that it is "counter-intuitive" to allow the Trust assets to enter the bankruptcy estate while simultaneously allowing the "power" (to effectuate a transfer of those assets) to remain with the debtor is misplaced. A "power" can continue to exist despite the ineffectiveness of its exercise. In this case, all of Mrs. Shurley's interest in the M.D. Bryant Trust is property of her bankruptcy estate under section 541(a). Thus, Mrs. Shurley has no property left to appoint. While Mrs. Shurley has not lost the power to make such an appointment, her post-petition exercise of the power has been rendered meaningless.

## C. Is injunctive relief proper?

■ Injunctive relief is proper because Plaintiffs have shown that they have no adequate remedy at law. To obtain preliminary injunctive relief, a movant must prove that:

(1) it is substantially likely to succeed on the merits,

(2) a substantial threat exists that the movant will suffer irreparable injury if the court does not grant the injunction,

(3) the threatened injury to the movant outweighs the threatened injury to the other party, and

(4) granting the injunction will not disserve the public interest.

*Sierra Club, Lone Star Chapter v. FDIC*, 992 F.2d 545, 551 (5th Cir.), *reh'g denied*, 3 F.3d 441 (5th Cir.1993). Where a movant seeks *permanent* injunctive relief, the second prong, irreparable harm, becomes a broader inquiry into the adequacy of any legal remedy. *Lewis v. S.S. Baune*, 534 F.2d 1115, 1123–24 (5th Cir.1976), *reh'g denied*, 545 F.2d 1299 (5th Cir.1977); 11 CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2944 at 399–401 (1973) (hereinafter referred to as WRIGHT & MILLER). Unlike the irreparable injury test, the inadequate remedy test looks to alternative modes of relief, however serious the initial injury, although often, irreparable harm alone is sufficient to satisfy this prong. *Lewis* at 1124. If movant does not succeed in carrying its heavy burden on any one of the four elements, the injunction may not issue. *Enterprise Int'l v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985). The importance of each of these elements, however, may vary with the facts of each case. Courts apply a sliding-scale type balancing to two elements in particular, adjusting the likelihood of success on the merits by the gravity of the harm incurred, such

that where, absent injunction, the harm is great to the plaintiff and insignificant to the defendant, the relative weight of the likelihood of plaintiff's success on the merits is diminished. *Canal Auth. v. Callaway,* 489 F.2d 567, 576–77 (5th Cir.1974); *see Cronin v. United States,* 919 F.2d 439, 445 (7th Cir.1990); *Roland Mach. Co. v. Dresser Indus.,* 749 F.2d 380, 387–388 (7th Cir.1984); 11 WRIGHT & MILLER § 2948; *see also Ohio Oil Co. v. Conway,* 279 U.S. 813, 815, 49 S.Ct. 256, 256–57, 73 L.Ed. 972 (1929) ("[w]here the questions presented by an application for an interlocutory injunction are grave, and the injury to the moving party will be certain and irreparable, if the application be denied and the final decree be in his favor, while if the injunction be granted the injury to the opposing party, even if the final decree be in his favor, will be inconsiderable, or may be adequately indemnified by a bond, the injunction usually will be granted").

Because Plaintiffs have been successful in this trial, the first element is established. The second element, balancing of the threatened injury to the Plaintiffs with the threatened harm to the Defendants, is also an easy matter, post-trial. The injury to the Plaintiffs is that the crown jewel of the bankruptcy estate, Mrs. Shurley's "interest" in the Trust, will be passed on to descendants if Mrs. Shurley successfully exercises her power of appointment. Plaintiffs would then be forced to recover bankruptcy estate assets from Mrs. Shurley's descendants under section 549. The injury to Defendant Mrs. Shurley is that she will be denied her Trust-given right to appoint Trust assets to her descendants. Given that this Court has determined that the property over which Mrs. Shurley may exercise her power is property of her bankruptcy estate, it is easy to conclude that she would suffer no legal injury were an injunction to issue. Defendant Armstrong will also suffer no injury because Mrs. Shurley's interest in the Trust merely has another owner. It is also difficult to imagine how an injunction prohibiting distributions would disserve the public interest, since neither Mr. Armstrong nor Mrs. Shurley retains an equitable or legal right to Mrs. Shurley's beneficial interest in the Trust.

■■■ The more difficult question is whether a substantial risk exists that Plaintiffs will suffer irreparable harm without an injunction or whether an adequate remedy at law exists. Where an equitable remedy is sought, the harm may be irreparable. Where a legal remedy is available, however, the harm is generally not irreparable. *F.D.I.C. v. Faulkner,* 991 F.2d 262, 265 (5th Cir.1993). Moreover, as a general rule, an injunction is not appropriate to secure post-judgment legal relief in the form of damages. *De Beers Consol. Mines v. United States,* 325 U.S. 212, 219–23, 65 S.Ct. 1130, 1133–36, 89 L.Ed. 1566 (1945); *ITT Community Dev. Corp. v. Barton,* 569 F.2d 1351, 1360–61 (5th Cir.1978). Such an injunction would be in the form of a "prejudgment attachment" requiring compliance with FED.R.CIV.P. 64. *F.S.L.I.C. v. Dixon,* 835 F.2d 554, 561 (5th Cir.1987). This case, however, has proceeded beyond the preliminary stage to judgment; post-judgment containment, not "prejudgment attachment," is the issue. Moreover, the Fifth Circuit has shown a willingness to embrace an exception to this general rule where the facts indicate the collection of a money judgment would be rendered virtually impossible absent an injunction. *Dixon* at 560 n. 1 (citing *Tri–State Generation & Transmission Assoc. v. Shoshone River Power, Inc.,* 805 F.2d 351, 355 (10th Cir.1986)); *Enterprise Int'l,* 762 F.2d at 473 ("[t]he absence of an available remedy by which the movant can later recover monetary damages, however, may also be sufficient to show irreparable injury"); *see Ohio Oil Co. v. Conway,* 279 U.S. 813, 815, 49 S.Ct. 256, 256, 73 L.Ed. 972 (1929).

In this case, Plaintiffs' concern about the liquidation of available assets is persuasive. Under Texas law, Mr. Armstrong has a duty to carry out Mrs. Shurley's appointment of assets. If he does, TCB and other creditors will be unable to obtain satisfaction of significant claims from the bankruptcy estate. Although such an appointment might be recoverable from multiple appointees under section 549, there is no guarantee that such assets will not be dissipated by the respective appointees in anticipation of Plaintiffs' pursuit. The substantial obstacles Plaintiffs will face under section 549 in trying to collect

widely dispersed assets serve to render that remedy "inadequate."

This conclusion is bolstered by cases finding the availability of money damages inadequate where the multiplicity of litigation would be necessary to collect such damages. *Foltz v. U.S. News & World Report,* 760 F.2d 1300, 1308 (D.C.Cir.1985) (remanding to allow the district court to enjoin employee benefits plan defendant from paying out plan assets to its numerous recipients, because the court found that if plaintiffs had to chase the assets disbursed to plan participants, the plaintiffs might never recover); *Lynch Corp. v. Omaha Nat'l Bank,* 666 F.2d 1208, 1212 (8th Cir.1981) ("Lynch's injury is irreparable and there is no adequate remedy at law because a multiplicity of suits would be required to gain relief").

 Finally, an injunction of this sort must be examined in light of bankruptcy policy. Cases disfavoring any sort of "prejudgment attachment" generally are concerned about the "preference" given to one creditor over other creditors, a policy objective the Bankruptcy Code sought to avoid. The requested injunction would not favor one creditor over any other, but rather it would assure that trust assets, now property of the bankruptcy estate, would not be improperly transferred and would be available for unsecured creditors pro rata. The request is narrow in scope and limited in its application. It only asks for preservation of property of the bankruptcy estate by preventing transfers of property of the estate. The injunction also provides direction to the Trustee, who may perceive conflicting duties under Texas and federal law. The injunctive relief requested is warranted and will issue.

### CONCLUSION

For the reasons stated in this Amended Opinion, Mrs. Shurley's one-half interest in the Trust does not qualify for spendthrift trust or discretionary trust protection which would exclude it from property of the estate. It is, therefore, property of the estate which must be turned over to Mr. Elam, the Chapter 7 Trustee. In addition, Mr. Armstrong, the Trustee of the Trust, must be enjoined from disbursing any of the beneficial interests previously held by Mrs. Shurley to anyone other than Mr. Elam, the Chapter 7 Trustee.

This Amended Opinion constitutes the findings of fact and conclusions of law of this Court pursuant to FED.R.BANKR.P. 7052. This Amended Opinion also supersedes the Court's prior opinion, and amends the prior findings of fact and conclusions of law stated orally and in open court and recorded on the Record following the close of evidence. A separate Judgment has been rendered.